IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

MARIE LAURENT-WORKMAN          :
1724 Flagstown Drive           :
Clarksville, TN 37042          :
                               :
        Plaintiff,             :        CIVIL ACTION NO.:
                               :        (Jury Trial Demanded)
v.                             :
                               :
RYAN MCCARTHY, SECRETARY,      :
UNITED STATES DEPARTMENT OF    :
THE ARMY                       :
101 Army Pentagon              :
Washington, D.C.  20310-0101   :
                               :
        Defendant.             :
_____:

## COMPLAINT

Plaintiff, Marie Laurent-Workman ("Ms. Laurent-Workman" or "Plaintiff"), by and

through her undersigned counsel, hereby brings this Complaint against Ryan D. McCarthy,

Secretary of the United States Department of Army ("Defendant"), by averring as follows:

## INTRODUCTION

1.      The present lawsuit is brought by Ms. Laurent-Workman, an Army Abuse

Program Specialist who was employed by the United States Department of the Army ("Army" or

"Agency"), for discrimination in federal employment based on race/color (African-

American/Black), national origin (Haitian American), and gender (female) and retaliation for

having engaged in protected activity.

2.      Ms. Laurent-Workman' claims are brought pursuant to Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., 42 U.S.C. § 2000e- 16(c)

(collectively referred to as "Title VII") and 29 C.F.R. § 1614.407.

1

3.      This action also seeks relief pursuant to 42 U.S.C. § 2000e- 3(a), as amended, which prohibits retaliation against an employee for engaging in protected activity.

4.      These claims, supporting facts and damages set forth in this action are referred to as the "Lawsuit."

## PARTIES

5.      Ms. Laurent-Workman was an employee of the Army, living and working abroad and whose United States legal residence is 1724 Flagstone Drive, Clarksville, TN 37042.   At all times relevant to this Lawsuit, Ms. Laurent-Workman was employed by Defendant and was an "employee" within the meaning of Title VII and its implementing regulations.

6.      Defendant, Ryan D. McCarthy, is the current Secretary of the Army and is the "employer" and Department head, within the meaning of Title VII and its implementing regulations.

7.      The Army operates an Army substance abuse program ("ASAP") at the United States Army Benelux, located in Belgium ("USAG Benelux"), which is administered through the Army Center for Substances Abuse Programs ("IMCOM ASAP").

8.      At all times relevant to this Lawsuit, Ms. Laurent-Workman was stationed at USAG Benelux and working under the Army's Department of Human Resources.  Similarly, all the actors and individuals identified herein were also employees of USAG Benelux acting within the scope and course of their employment and authority.

## JURISDICTION AND VENUE

9.      Jurisdiction of this matter arises under 42 U.S.C. § 2000e-5(3).

10.     Venue is proper in the United States District Court for the Eastern District of Virginia under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), as the pertinent employment

practices, though mainly committed overseas, were done by Army employees and the Army's principal office is located in Fairfax County, Virginia.

## ADMINISTRATIVE UNDERTAKINGS

11.    On February 6, 2019, Ms. Laurent-Workman filed a formal complaint with USAG Benelux's Equal Employment Opportunity Office alleging discrimination and harassment on the bases of race/color (African-American/Black), national origin (Haitian American), gender (female) and retaliation.

12.    The complaint was assigned a Docket Number of AREUBENEL19JAN00122. ("Complaint 1").

13.    On February 19, 2019, following the filing of the Complaint 1, the Agency issued a letter of acceptance of the complaint for investigation.

14.    On July 15, 2019, the Agency issued an amended letter of acceptance extending the scope of Complaint 1 to include subsequent events and additional incidents of discrimination and/or retaliation as alleged by Ms. Laurent-Workman.

15.    The Investigations and Resolution Directorate ("IRD") performed an investigation and a Report of Investigation ("ROI").

16.    On November 14, 2019, Ms. Laurent-Workman filed a second formal complaint with USAG Benelux's Equal Employment Opportunity Office alleging discrimination and harassment on the bases of race/color (African-American/Black), national origin (Haitian American), gender (female) and retaliation.

17.    The complaint was assigned a Docket Number of AREUBENEL19SEP03590. ("Complaint 2").

3

18.     On November 25, 2019 the Agency issued a letter of acceptance of the complaint for investigation.

19.     On January 27, 2020, the Agency issued an amended letter of acceptance for Complaint 2 extending the scope of Complaint 2 to include subsequent events and additional incidents of discrimination and/or retaliation as alleged by Ms. Laurent-Workman.

20.     On April 17, 2020, the Agency issued a second amended letter of acceptance for Complaint 2 extending the scope of Complaint 2 to include additional subsequent events and ongoing incidents.

21.     The Agency retained an outside contract vendor known as Delany, Siegel, Zorn & Associates to perform an administrative investigation for Complaint 2 and a Report of Investigation ("ROI").

22.     Ms. Laurent-Workman requested a Final Agency Decision ("FAD") for both Complaint 1 and 2.

23.     The FAD for Complaint 1 was received by Ms. Laurent-Workman on August 13, 2020.  The FAD for Complaint 2 was received by Ms. Laurent-Workman on July 31, 2020.  Both FAD's denied all forms of relief to Ms. Laurent-Workman.

24.     Ms. Laurent-Workman has ninety calendar days to initiate a lawsuit in federal court following the issuance of the FAD, which she has done.

25.     All conditions precedent necessary to file this Lawsuit have been met and this action is timely filed.

## **FACTS**

### Initial Background at USAG Benelux

26.     Ms. Laurent-Workman was a career civilian employee with the Army who served in various capacities in several installations throughout the United States, Far East Region and Europe since 2011.

27.     In November of 2017, Ms. Laurent-Workman assumed the position of ASAP Specialist (GS-11-0101) at USAG Benelux in Belgium.  Her position came under the Directorate of Human Resources, Army Substance Abuse Program.

28.     As an ASAP Specialist, Ms. Laurent-Workman was tasked with duties and responsibilities supporting the Risk Reduction Program, Suicide Prevention Program, Prevention Program as well as advisor and program improvement.

29.     Ms. Laurent-Workman's first line supervisor was Jasser Khalifeh ("Mr. Khalifeh")(Brown, Caucasian of Jordanian descent, male), the ASAP Manager.  Her second line supervisor up through the beginning of July 2019 was Shun Thomas ("Mr. Thomas")(African-American/Black male), who was the Acting Director of Human Resources.  Beginning on July 7, 2019, Yvette Castro ("Ms. Castro") became the Director of Human Resources.

<u>Harassment by Ms. Adams</u>

30.     Shortly after assuming the position of ASAP Specialist, Ms. Laurent-Workman was introduced to a co-worker named Dorothea Adams ("Ms. Adams")(Caucasian, Dutch, female), an individual who initially held the position of Drug Testing Coordinator, but was later given the additional title of ASAP Coordinator , even though the dual position did not exist at and was not recognized by IMCOM ASAP.

31.     Ms. Adams is a Dutch national and local civilian employee who was placed at USAG Benelux through the Dutch Ministry of Defence but was supervised by Mr. Khalifeh and worked under ASAP.

32.     Although Ms. Laurent-Workman and Ms. Adams worked in different duty locations, their stated job descriptions and positions had overlapping responsibilities.

33.     Ms. Adams was not pleased that Ms. Laurent-Workman had been hired and that her job was such that she would be handling matters Ms. Adams believed were hers to handle. Ms. Adams' reaction to Ms. Laurent-Workman was to denigrate her and repeatedly took actions to undermine Ms. Laurent-Workman's work and reputation.

34.     In short order, Ms. Adams elevated what began as relatively minor incidents of conflict into serious harassment and mistreatment, which were fueled by racial animus.

"Blacks Cannot Speak Properly"

35.     At an early point working together, Ms. Adams made a racially insensitive comment to Ms. Laurent-Workman and others that "blacks cannot speak properly" and that she "cannot understand them."  The statement was quite revealing as to the negative animus she held against African-Americans/Blacks in general.

36.     Though Ms. Laurent-Workman was taken aback by Ms. Adams's rude and obvious dislike of African-Americans/Blacks, she made efforts to work with Ms. Adams in their roles supporting ASAP.

37.     Ms. Adams, however, did not wish to work with Ms. Laurent-Workman, and continued in an active campaign to malign and harass Ms. Laurent-Workman.

38.     Although Ms. Laurent-Workman complained to Mr. Khalifeh and Ms. Thomas several times about the mistreatment she was subjected to by Ms. Adams conduct, they refused to look into the gravity of Ms. Laurent-Workman's complaints and, instead, provided excuses for Ms. Adams' behavior.  This failure to address Ms. Laurent-Workman's concerns allowed a

6

hostile work environment to continue.  Not only did the failure allow the hostility to continue, but it was disparate treatment in that they sided with Ms. Adams over Ms. Laurent-Workman.

39.     For example, on May 22, 2018, a staff meeting took place in Mr. Khalifeh's office.  During this meeting, Ms. Laurent-Workman suggested that training be conducted for high-risk data collection to rectify inaccurate trend analyses and reports, which had caused some program credibility issues.  The inaccuracies were largely caused by faulty data collected by Ms. Adams.

40.     Instead of responding to Ms. Laurent-Workman's suggestion, Mr. Khalifeh deferred to Ms. Adams and asked what she thought of the recommendation.

41.     Ms. Adams reacted angrily and accused Ms. Laurent-Workman of trying to take away her job.  When, Ms. Laurent-Workman explained that she was trying to address and fix incorrect data collection problem, Mr. Khalifeh rebuffed her concern and dismissively stated that the "matter is settled – Ms. Adams will continue with the collection."

42.     On June 7, 2018, Mr. Khalifeh denied Ms. Laurent-Workman's request to attend a national suicide prevention conference, an important training conference that would have allowed her to obtain hours towards her certification and provide opportunities to meet and network with other prevention professionals, in furtherance of her job position.

43.     No reason was given by Mr. Khalifeh for his decision but he stated that he "might" be attending training.  This reason made little sense because his attendance would not have been a hindrance on Ms. Laurent-Workman being able to attend.

44.     Ultimately, Mr. Khalifeh did not attend training during the national suicide prevention conference.

"<u>You Fail to Understand Ms. Adams is Dutch</u>"

45.    In June of 2018, Ms. Laurent-Workman scheduled a meeting with Mr. Khalifeh during which she complained that he was displaying disparate and more favorable treatment towards Ms. Adams.  She also complained that she was afraid to speak to Ms. Adams because of the blatant hostility against her by Ms. Adams.

46.    Ms. Laurent-Workman' complaints in this regard was a protected activity in that she was attempting to oppose the practices, harassment and treatment that she in good faith believed to be discriminatory and illegal.

47.    However, instead of investigating these serious allegations or taking any action to remediate the harassing work environment, Mr. Khalifeh, again, dismissively suggested to Ms. Laurent-Workman that she failed to understand that Ms. Adams is Dutch, providing her nationality as an excuse for her harassing behavior towards Ms. Laurent-Workman.

## "You People"

48.    On July 23, 2018, Ms. Laurent-Workman politely asked Ms. Adams to provide her a copy of a course agenda so that she could prepare to teach a class of soldiers a prevention module, which was required by her position description and was an express standard for her annual evaluation.

49.    As usual, Ms. Adams reacted in a hostile and aggressive manner to this simple request, and told Ms. Laurent-Workman that she was to have nothing to do with "her class" and refused to provide the agenda.

50.    Ms. Laurent-Workman attempted to explain that she was required to teach the prevention module, part of 40-hour didactive Unit Prevention Leaders course pursuant to Army regulation AR600-85.

51.    In the midst of this discussion, Ms. Adams challenged Ms. Laurent-Workman,

8

disputing whether the course was supposed to be a full 40 hours in length.  Ms. Adams insisted it was to be presented in a condensed three-day version.

52.    Ms. Adams erupted in anger and said this is NATO, we do things differently than "you people," a remark that further revealed Ms. Adams animus against African-Americans/Blacks and those she perceived as being different from her.

53.    On several prior occasions, Ms. Adams had referred to African-American/Black soldiers as "these people," and further stated she could not understand African-Americans/Blacks during a Unit Prevention leaders class and that it irritated her when they spoke.

54.    Due to Ms. Adams' escalating anger and hostility during this meeting, Ms. Laurent-Workman tried to leave the meeting and retreat to the safety of her own office.

55.    As Ms. Laurent-Workman began exiting the office, Ms. Adams continued on her tirade and followed Ms. Laurent-Workman out of the room and into her office.  As she followed her, she continued to accuse her.  Ms. Adams' extreme behavior caused Ms. Laurent-Workman to become very upset and she was physically shaken and fearful.

### Reporting the Incident to Mr. Thomas

56.    Ms. Laurent-Workman reported the incident to Mr. Thomas in person, her second line supervisor.  During this in-person meeting, she repeated stated that she was being harassed by Ms. Adams and underscored that her prior complaints had been ignored and, because of that, her working conditions remained hostile due to Ms. Adams actions and management's inaction.

57.    Ms. Laurent-Workman's complaints to Mr. Thomas was a protected activity because she was opposing the practices, harassment and treatment that she, in good faith, believed to be discriminatory and illegal.

9

58.     Mr. Thomas refused to accept the serious allegations and complaints asserted by Ms. Laurent-Workman.  His face, mannerisms and words reflected incredulity.  His only reaction was a dismissive statement that he would address the situation upon Mr. Khalifeh's return from vacation.

59.     As expected, Mr. Thomas did not follow through and neither Mr. Thomas nor Mr. Khalifeh ever performed an investigation or took any prompt, remedial action of any kind.

### Removal of Job Responsibilities

60.     Instead of addressing the racial and hostile working environment in the unit, Mr. Khalifeh began taking purposeful steps to retaliate against Ms. Laurent-Workman.  One of these steps was to remove more than a quarter of Ms. Laurent-Workman's  job responsibilities.

61.     On August 10, 2018, Mr. Khalifeh confirmed he removed a quarter of Ms. Laurent-Workman's responsibilities as reflected on her position description and gave them to Ms. Adams.

62.     Mr. Khalifeh forwarded an email indicating that Ms. Adams would now perform all data collection and entry for the Risk Reduction Program and that, "Ms. Adams will serve as primary SPPM and Ms. Laurent-Workman will serve as the alternate."

63.     Although Ms. Laurent-Workman's position and grade did not change due to this the *de facto* demotion, the removal of responsibilities was humiliating and damaged her career advancement by making her far less visible within the Unit, ASAP, and those in leadership positions.

### Slander of an African-American Drug Testing Chief

64.     On September 5, 2018, Mr. Laurent-Workman witnessed Ms. Adams disparaging the IMCOM ASAP Drug Testing Chief, an American-American/Black woman.  Ms. Adams

announced in front of Ms. Laurent-Workman and Mr. Khalifeh that the Drug Testing Chief was reporting to work under the influence of alcohol. At the time she stated this, the door was open to a hallway that many people walking by.

65.    Ms. Laurent-Workman was appalled by this unfounded statement. Understanding how this type of rumor can ruin a career, Ms. Laurent-Workman promptly addressed this with Mr. Khalifeh, via email.

66.    Once again, instead of performing an investigation or addressing Ms. Adams' improper conduct, Mr. Khalifeh instead ordered Ms. Laurent-Workman not to contact Ms. Adams. Insofar as Ms. Laurent-Workman had to work with Ms. Adams in order to do her job, this order interfered with her ability to do her job. In addition, it cast Ms. Laurent-Workman as the problem.

67.    This disciplinary action against Ms. Laurent-Workman caused her greater anxiety and stress.

<u>Telephonic Meeting- August 31, 2018- "Do you Like Your Job?"</u>

68.    On August 31, 2018, Ms. Laurent-Workman contacted Mr. Thomas, via telephone, to discuss the unwarranted removal of her job responsibilities, her prior complaints, and management's failure to address her complaints.

69.    Ms. Laurent-Workman's meeting with Mr. Thomas was a form of protected activity in that she was opposing the practices, harassment and treatment that she, in good faith, believed to be discriminatory and illegal.

70.    In response to Ms. Laurent-Workman's ongoing complaints, Mr. Thomas' callously retorted something to the effect, "do you like your job?"

11

71.    Mr. Thomas's statement and tone conveyed that he was not only dismissive of her complaints, but was overtly threatening her for having the audacity to raise complaints in the first instance.  Mr. Thomas's statement was a threat and was meant to dissuade Ms. Laurent-Workman from taking further actions to support her complaints.

### Blacks Excel at Sports Because Slave Masters Bred the Strongest Slaves Together

72.    In September of 2018, there was a suicide prevention event hosted at USAG Benelux attended by ASAP leadership and other behavioral health professionals throughout the Army's European theatre.

73.    During a break at the event, Mr. Khalifeh and others were discussing sports and Mr. Khalifeh interjected the issue of race into the discussion, particularly with regard to black athletes.

74.    Specifically, Mr. Khalifeh made several statements with revolting racial animus, including his stated belief that "the reason black male athletes excel is sports is because the slave masters had bred the strongest slaves together."

75.    Ms. Laurent-Workman was horrified and offended by this statement, which was made her presence and others, including Lathan Newkirk (African-American/Black), an ASAP Program Manager who had travelled from Vicenza, Italy to attend the event.

76.    Mr. Khalifeh's comments were harassing and confirmed Ms. Laurent-Workman's belief that he had racial animus against African American/Black people.

77.    Mr. Khalifeh's statements were made openly and in front of many.  No action was taken to stop Mr. Khalifeh's illegal statements and conduct.

### Reprimand- September 24, 2018

12

78. On September 24, 2018, Mr. Khalifeh issued a verbal reprimand to Ms. Laurent-Workman for, purportedly, coordinating program activities with the Brussels American school.

79. When Ms. Laurent-Workman informed him that the Brussels school had directly reached out to her, he demanded proof so he could assure Ms. Adams that Ms. Laurent-Workman was not trying to "step on her toes."

80. The incident was another example of disparate treatment and harassment against Ms. Laurent-Workman.

81. Coordinating such program activities fell squarely within Ms. Laurent-Workman's job description, and the decision to reprimand her was an attempt to show further favoritism to Ms. Adams and harass and retaliate against Ms. Laurent-Workman.

82. It was during this period that Mr. Khalifeh informed Ms. Laurent-Workman he had changed Ms. Adams' job title from Drug Testing Coordinator to Drug Testing Coordinator/ASAP Coordinator - despite the fact that such a job position and description did not exist.

83. Mr. Khalifeh's *de facto* promotion of Ms. Adams was done to assist Ms. Adams with her career advancement and done to harm Ms. Laurent-Workman.

<u>Ongoing Complaints to Mr. Thomas</u>

84. In early October of 2018, Ms. Laurent-Workman once again approached Mr. Thomas to report the ongoing hostile working environment and the ongoing reprisal by Mr. Khalifeh. She informed Mr. Thomas that Mr. Khalifeh was subjecting her to hyper-scrutiny, castigating without basis, and berating her.

85.     During this meeting, Ms. Laurent- Workman mentioned that she was "fighting" to do her job, and that her position had been marginalized and minimized within the Unit and ASAP.

86.     Ms. Laurent-Workman's complaints to Mr. Thomas were protected activity because she was opposing the practices, harassment and treatment that she, in good faith believed to be discriminatory and illegal.

87.     Mr. Thomas, however, never followed through with an investigation or took any prompt, remedial action of any kind.  Instead, he simply perceived Mr. Laurent-Workman's ongoing issues with Mr. Adams to be akin to a "cat-fight" between two females and not worthy of addressing.

88.      For example, on October 9, 2018, Ms. Laurent-Workman was forced to contact Mr. Thomas to have him request certain risk reduction data from Ms. Adams that Ms. Laurent-Workman needed in order to make a presentation scheduled later that week.

89.     Instead of simply directing Ms. Adams to supply the information, Mr. Thomas instead repeatedly interrogated Ms. Laurent-Workman as to why she needed the information and refused to intercede.

90.     It took repeated requests from Ms. Laurent-Workman before Mr. Thomas eventually relented and directed Ms. Adams to provide the information.

<u>High Level Meetings- November 9 and 16, 2018</u>

91.     Exasperated by the ongoing diminution of her role and responsibilities in the Unit and ASAP, Ms. Laurent-Workman demanded a meeting with her supervisors, Ms. Adams and Mr. Tom Joyce ("Mr. Joyce").  Mr. Joyce was the Deputy Garrison Commander.

92.     The first meeting took place on November 9, 2018, with Mr. Joyce, Mr. Thomas

14

and Mr. Khalifeh.  Mr. Joyce instructed Mr. Thomas and Mr. Khalifeh to meet with both Ms. Laurent-Workman and Ms. Adams and to clarify the duties for each.  This subsequent meeting occurred on November 16, 2018 and was for the purpose of discussing the separation functions of ASAP and to provide clearer guidance on specific position descriptions and duties of the ASAP specialist position at USAG Benelux.

93. Specifically, Ms. Laurent-Workman was seeking clarification of her position insofar as Mr. Khalifeh had removed significant portions of her responsibilities and given them to Ms. Adams.

94. Ms. Laurent-Workman brought her position description of the ASAP Specialist position along with her to the meeting in addition to the stated Army regulatory requirements for the position.

95. Shortly after the meeting commenced, Ms. Adams became agitated and aggressive.  She mimicked Ms. Laurent-Workman's voice and speech patterns, pointed at her aggressively and referred to Ms. Laurent-Workman as "you people."  Though she did this in front of her supervisors and the Deputy Garrison Commander, none of them did anything to stop it.

96. The only thing Mr. Thomas did was to attempt to redirect Ms. Adam's to another topic but she continued to mock and berate Ms. Laurent-Workman.  Then, she abruptly stood-up in a violent fashion causing her chair to crash into the wall, screamed at Ms. Laurent-Workman and stormed out of the room.

97. No meaningful action was taken against Ms. Adams for her violent and racist behavior.

98. Instead, both Mr. Khalifeh and Mr. Thomas remained in the room and stated that they needed to make sure Ms. Adams was okay, adding that they were worried about Ms. Adams and that she should not drive because she was upset. Tellingly, they expressed no concern toward Ms. Laurent-Workman.

<u>Ongoing Disparate Treatment and Harassment</u>

99. On October 25, 2018, Ms. Laurent-Workman was in a meeting in Mr. Khalifeh's office during which he was discussing upcoming tasks and activities. During the meeting, he turned to Ms. Adams and stated he had emailed a checklist for Suicide Prevention, and asked Ms. Adams to circulate the list.

100. Mr. Laurent-Workman politely asked Mr. Khalifeh to forward her a copy of the checklist, since Suicide Prevention fell within her work description.

101. Mr. Khalifeh refused to do so. Instead, he ordered her to go outside the unit and contact the Army's Installation Management Command (IMCOM) for the checklist.

102. Mr. Khalifeh's actions were another example of daily harassment and disparate treatment in creating purposeful obstacles to increase the difficulty of Ms. Laurent-Workman's working environment.

103. On November 28, 2018, Mr. Khalifeh formally denied Ms. Laurent-Workman's request to attend suicide prevention training in Germany.

104. The training in question applied to her Applied Suicide Intervention Skills Training ("ASIST") certification, and would have allowed her to meet the Army required training for professionals.

105. Mr. Khalifeh's reason for denial of the training request was that the federal budget had not yet been approved.

106.    This explanation, however, was a complete pretext and completely undercut Mr. Khalifeh's mandate just a few weeks earlier that there was an "urgent" need to spend the current budget.  Although Mr. Khalifeh did promise to confer with Mr. Thomas regarding the request, Ms. Laurent-Workman was never approved.

107.    The denial of training was just another example of the daily harassment and disparate treatment Ms. Laurent-Workman suffered from Mr. Khalifeh and he had, theretofore, denied, delayed or otherwise interfered with training requests by Ms. Laurent-Workman.  This was in contrast to the approval of similar requests from Ms. Adams.  By missing training, Ms. Laurent-Workman was put in a professional disadvantage and her career trajectory was affected.

108.    Mr. Laurent-Workman's duties include teaching a module of the Unit Prevention Leaders ("UPL") course for soldiers, which involves relying on an instructor's manual for the teaching presentation.

109.    On December 13, 2018, Ms. Adams forwarded an accusatory email to Ms. Laurent-Workman stating that Ms. Laurent-Workman had failed to teach or "skipped" one important prevention aspect from the UPL manual.  Ms. Adams copied this email to Mr. Khalifeh.

110.    Given that Ms. Laurent-Workman had taught the prevention materials during her last class, she responded to Ms. Adams that her accusations were baffling.

111.    Almost immediately after responding, Mr. Khalifeh called Ms. Laurent-Workman to defend Ms. Adams, claiming that Ms. Adams had simply misunderstood.

112.    Mr. Khalifeh's patronizing excuses for Ms. Adams was another example of the disparate treatment and favoritism he routinely exhibited in her favor.

<u>Ms. Laurent-Workman' EEO Contact</u>

17

113.    On December 13, 2018, Ms. Laurent-Workman went to the Agency's EEO office to meet with an EEO counsel to initiate a complaint of discrimination and reprisal.

114.    Ms. Laurent-Workman's actions constituted protected activity under the Agency's EEO policies and the law.

115.    Upon information and belief, both Mr. Khalifeh and Ms. Adams were aware that Ms. Laurent-Workman was in the process of filing a formal complaint of discrimination and reprisal, which identified both of them as respondents..

Sabotage of Meeting Minutes

116.    ASAP conducts a monthly meeting at USAG Benelux, which is styled as the Comprehensive Soldier Family Fitness meeting and is chaired by Mr. Khalifeh, the ASAP Program Manager.

117.    In connection with her risk reduction responsibilities, Ms. Laurent-Workman is required to present risk-reduction data and trends analysis and to propose mitigation plans to unit leaders.

118.    The monthly meeting is recorded and the minutes of the meetings are later transcribed in paper format and disseminated to all attendees.

119.    During the monthly meeting on December 13, 2018, Ms. Laurent-Workman was not able to present any risk-reduction data given that Ms. Adams, the person tasked with collecting the risk-reduction data, had not compiled the necessary data.  This failure was then reflected in the monthly meeting minutes that were submitted for signature on January 7, 2019.

120.    However, in a blatant act of cover-up and sabotage, on February 4, 2019, Mr. Khalifeh altered the minute meeting to remove and sanitize any mention of Ms. Adams' name

18

and malfeasance in the minutes, while leaving Ms. Laurent-Workman's name in the meeting minutes to make it appear as if it were her fault.

121.    These actions were, once again, part of an ongoing disparate campaign by Mr. Khalifeh to protect Ms. Adams and harm Ms. Laurent-Workman.

Ms. Laurent-Workman' EEO Complaint

122.    On February 6, 2019, Ms. Laurent-Workman filed a formal EEO complaint of discrimination and retaliation with the Agency's EEO office.

123.    Ms. Laurent-Workman's filing of the complaint constituted protected activity under the Agency's EEO policies and the law.

124.    Mr. Khalifeh and Ms. Adams were aware that Ms. Laurent-Workman had identified them in her complaints of discrimination and retaliation, including in the formal complaint of discrimination and reprisal.

Requiring Ms. Laurent-Workman to Perform Multiple Positions

125.    On March 13, 2019, Mr. Khalifeh sent an email to all commanders stating that Ms. Laurent-Workman was now the primary point of contact for military drug testing matters.

126.    Thereafter, Mr. Khalifeh forwarded another email to IMCOM relaying the same message that Ms. Laurent-Workman would be taking over all Drug Testing Coordinator ("DTC") duties in Ms. Adams' absence.

127.    The drug testing duties and responsibilities were historically handled by Ms. Adams, who planned to go on leave.  Hence, in practical terms, Mr. Khalifeh was requiring Ms. Laurent-Workman to perform the duties of her position and that of Ms. Adams's DTC position.

128.    Ms. Laurent-Workman addressed these additional duties with Mr. Khalifeh.

19

129. Mr. Laurent-Workman informed Ms. Khalifeh that the additional tasks being put upon her were duties that comprised a separate job, altogether and she sought clarification from Mr. Khalifeh, why she was being made to take on another position in addition to her position.

130. She followed up with Mr. Khalifeh with paperwork showing that the additional duties imposed on Ms. Laurent-Workman were not part of her position description, and Army regulations make clear that a position description cannot be changed without IMCOM concurrence.

131. Mr. Khalifeh completely ignored Ms. Laurent-Workman's concerns and required her to perform the additional duties.  Mr. Khalifeh also ignored the many alternatives suggested by Ms. Laurent-Workman on how DTC duties could be handled while Ms. Adams was on leave.

132. Throughout this time Ms. Laurent-Workman performed all three positions of ASAP Specialist, Drug Testing Coordinator and ASAP Coordinator.

133. On May 2, 2019, Mr. Khalifeh contacted Ms. Laurent-Workman and indicated her performance standards had been updated for her upcoming performance appraisal.  The new standards specifically included a reviewable drug-testing element.

134. As a result, on May 3, 2019, Ms. Laurent-Workman forwarded an email to Mr. Khalifeh seeking clarification on her new job description and addressing Mr. Khalifeh's altering of her job description.

135. Among other issues, Ms. Laurent-Workman questioned whether she would be entitled to overtime to perform the additional duties and asked if her position would be re-evaluated for reclassification and possible promotion given that she was now performing multiple jobs.

136. Knowing that Ms. Laurent-Workman had grounds to seek overtime and/or reclassification or promotion under the circumstances, Mr. Khalifeh quickly reversed course and removed the drug-testing element from her performance standards but still required her to perform the additional duties of Ms. Adams' positions.

137. On June 5, 2019, Mr. Khalifeh contacted Ms. Laurent-Workman to discuss whether she could clear her entire schedule to teach a full DTC course to soldiers during the first week of September, including those portions of the course that are not contemplated by her position description.

138. In response, Ms. Laurent-Workman offered to teach the prevention portion of the DTC course, but indicated she would not have the time to teach the *entire* 40-hour course itself given her significant obligations in September and October in connection with her prevention and other risk reduction duties.

139. Mr. Khalifeh's mockingly responded, "I thought you cared about taking care of soldiers," or words to that effect.

140. Throughout this time, Ms. Laurent-Workman was required to perform DTC duties in addition to the existing responsibilities of her ASAP position.

<u>Installation Prevention Team Meeting- August 8, 2019</u>

141. Per Army requirements, an Installation Prevention Team ("IPT") meeting must take place every quarter for the purpose of discussing and identifying high-risk trends with subject matter experts to establish applicable mitigation strategies.

142. In her role as ASAP Specialist and coordinator of the Risk Reduction Program, Mr. Laurent-Workman facilitates the IPT meetings and spends weeks in advance preparing data, coordinating and communicating with participants.

143.    An IPT meeting was scheduled on August 8, 2019.

144.    As usual, Ms. Laurent-Workman spent weeks preparing for the IPT meeting, which included providing Mr. Khalifeh with a copy of the power point slides, briefing the Director of Human Resources, and providing information to the Garrison Commander on a read-ahead basis.

145.    On the date of the meeting, Mr. Laurent-Workman arrived early and was scheduled to present and discuss high-risk data and trends analysis, which was part of her position description and required by Army regulations.

146.    After the meeting began, Mr. Khalifeh prevented Ms. Laurent-Workman from presenting her findings or power point presentation, which interfered with her tasked responsibilities.  This marginalization and suppression served to undermine her professionally and caused her embarrassment and humiliation in front the Garrison Commander and other leaders.

147.    After the meeting, Mr. Khalifeh mentioned that the Garrison Commander, Col. Sean Kuester ("Col. Kuester") was the individual who had discussed changing the meeting.

148.    However, at no time did Mr. Khalifeh inform Ms. Laurent-Workman before the meeting that she would not be presenting.  Further, and at odds with Mr. Khalifeh's statement, Col. Kuester expressed genuine surprise during the IPT meeting that her presentation was cancelled.

149.    Mr. Khalifeh's actions were fueled by his dislike of Ms. Laurent-Workman and he repeatedly sought to harass, discriminate, retaliate and humiliate Ms. Laurent-Workman and minimize her role in front of leadership at the IPT meeting and otherwise harm her professional standing.

22

Disparate Denial of Christmas Week Leave

150.    On or about August 27, 2019, Mr. Laurent-Workman requested to use several accumulated days of her annual leave during the Christmas holiday, specifically December 23, 2019 through December 27, 2019.

151.    Approximately a week later, on September 4, 2019, Ms. Laurent-Workman was informed that her leave had been denied. The reason given was that someone needed to be in the office, physically.

152.    Not surprisingly, both Ms. Adams and Mr. Khalifeh later had leave approved for that same period, even though they requested their leave after Ms. Laurent-Workman.

153.    In addition, the decision to deny leave was patently unjust given that Ms. Laurent Workman was also required to work during Christmas week in 2017 and the ASAP office was closed during Christmas week in 2018.  As such, the only person who had been required to work during the holidays in the prior three Christmas weeks was Ms. Laurent-Workman.

154.    The denial of Ms. Laurent-Workman's leave request was harassing, retaliatory and disparate treatment, which prevented her from spending family time with her husband who is active duty Army, stationed in Bristol, Tennessee.

Monthly Workgroup Meeting – September 12, 2019

155.    On or about September 12, 2019, Mr. Laurent-Workman was attending a monthly workgroup meeting with an assortment of high-level military and civilian leaders, including a Battalion Commander, a Commander for Survey Company, the Preventive Medicine Chief, and many others.  The meeting was chaired by Mr. Khalifeh.

156.    At the conclusion of the workgroup meetings, it is standard practice and procedure for all presenters to present final thoughts on the information shared during the

23

workgroup.  As meeting chair, Mr. Khalifeh would point to each presenter in turn to allow them to present final thoughts.

157.    Incredibly, when it was Ms. Laurent-Workman's time to speak and present final thoughts, Mr. Khalifeh purposely skipped over her to prevent her from speaking in any fashion.

158.    Despite being purposefully skipped, Mr. Laurent-Workman attempted to signal that she had information to share, at which point Mr. Khalifeh interrupted her and loudly stated "thank you everyone for coming," ending the meeting.

159.    Mr. Laurent-Workman was thoroughly humiliated by Mr. Khalifeh's actions, which were just another ongoing example of his protracted campaign to harass, retaliate, demean, ostracize, marginalize, sabotage and harm Mr. Laurent-Workman's professional standing in front of leadership.

<u>Phantom Progress Review- September 20, 2019</u>

160.    On September 20, 2019, Ms. Laurent-Workman received notification from the Defense Civilian Personnel Data System ("DCPDS") that her mid-year performance review had been completed.

161.    Ms. Laurent-Workman was perplexed by the notice because she had not yet met with Mr. Khalifeh for her current appraisal period or to discuss performance standards for that period.

162.    Ms. Laurent-Workman logged onto the DCPDS website.  The website indicated that both she and her supervisor had completed a progress review, which was not so.

163.    Ms. Laurent-Workman was not comfortable signing the document because none of the normal processes had been adhered to.

<u>Further Incidents of Undermining Authority</u>

24

164.    On September 17, 2019, Ms. Laurent-Workman was temporarily designated as Acting ASAP Manager for a one-week period running from September 23, 2019 through October 1, 2019 due to Mr. Khalifeh's unavailability.

165.    As Acting ASAP Manager, Mr. Laurent-Workman was prepared for and planning to attend a USAREUR Commanders Ready and Resilient Council meeting, scheduled for September 23, 2019.

166.    However, immediately prior to the meeting Mr. Khalifeh requested that Byron Wiley ("Mr. Wiley"), a community service family advocate, attend the meeting on his behalf, instead of Ms. Laurent-Workman.

167.    Mr. Wiley was stationed several hours away from USAG Benelux and was located in the Netherlands.  Further, Mr. Wiley had little understanding of the ASAP CR21 program at the Garrison.

168.    Once again, Mr. Khalifeh's actions were intended to harass, retaliate, demean, ostracize, marginalize, sabotage and harm Mr. Laurent-Workman.

<u>Ms. Laurent-Workman' Second EEO Complaint</u>

169.    On or about October 19, 2019, Ms. Laurent-Workman filed a second formal EEO complaint of discrimination and retaliation with the Agency's EEO office.

170.    The filing of the complaint constituted protected activity under the Agency's EEO policies and the law.

171.    Mr. Khalifeh and Ms. Adams were aware that Ms. Laurent-Workman had filed several complaints of discrimination and retaliation, including the second formal complaint of discrimination and reprisal.

<u>Severe Physical and Emotional Distress</u>

172.     The cumulative effect of the behavior by Ms. Adams and the campaign of harassment and retaliation by Mr. Khalifeh caused Ms. Laurent-Workman to suffer both physical and mental health problems, including severe emotional anguish, anxiety and other physical manifestation.

173.     Ms. Laurent-Workman was often afraid to speak at work, come to work, interact with Mr. Khalifeh and was in a constant state of walking on proverbial "egg shells."

174.     On many days she would take her break and go to her car to cry.

175.     Ms. Laurent-Workman has developed a severe and exacerbated migraine condition, and is on prescription medication for anxiety among other ailments, all of which are directly and causally related to the work environment with the ASAP Program.

176.     For obvious reasons, Ms. Laurent-Workman began to look for other opportunities that would remove her from this work environment.

Sabotage of Ms. Laurent-Workman's Interest in a Vacant Program Coordinator Position

177.     On or about November of 2019, there a vacancy announcement for the position of Community Readiness and Resilience Integrator/Employee Assistance Program Coordinator.

178.     Upon information and belief, the selecting official for the vacancy was Yvette Castro ("Ms. Castro"), the Director of Human Resources.

179.     Ms. Laurent-Workman expressed interest in this position.  Mr. Khalifeh found out about her interest in this position when he returned from leave, on or about November 26, 2019.

180.     In a blatant act of career development sabotage, Mr. Khalifeh emailed Ms. Castro on December 2, 2019 and, therein, mocked Ms. Laurent-Workman's interest and qualifications for the position, stating in part, "[v]ery interesting, all of the sudden she is tracking CR2C events that she had no interest in earlier."

26

181.    Mr. Khalifeh's purposely disparaged Mr. Laurent-Workman to Ms. Castro by falsely claiming that she had no interest in the subject matter of the position, which was meant to sabotage her eventual candidacy.

182.    Unbeknownst to Mr. Khalifeh at the time, he accidently sent the message to Ms. Laurent-Workman, who otherwise would have been unaware of his sabotage.  This indicated to Ms. Laurent-Workman that Mr. Khalifeh had other communications with Ms. Castro and others, where he was disparaging Ms. Laurent-Workman and that this email was not the only disparaging communication.  Mr. Khalifeh further disparaged Ms. Laurent-Workman when he informed Ms. Castro that he would not "rehire" her.

183.    There was no business related reason for Mr. Khalifeh to send the email to Ms. Castro other than to poison her opinion of Ms. Laurent-Workman.  Moreover, Ms. Laurent-Workman had always met or exceeded her performance objectives and, therefore,  Mr. Khalifeh had no justified work related reason to inform Ms. Castro that he would not "rehire" Ms. Laurent-Workman .  Rather, Mr. Khalifeh's reasons for disparaging Ms. Laurent-Workman and sabotage her promotion was because of his discriminatory animus and anger at Ms. Laurent-Workman's protected activity.

184.    Despite the clear acts of sabotage, Ms. Laurent-Workman proceeded to apply for the position, on or about December 6, 2020.  Predictably, because of the disparaging and negative influence by Mr. Khalifeh, she was not selected for the position.

185.    Mr. Khalifeh did not sabotage and interfere with Ms. Adams's career.  Moreover, he encouraged a Caucasian employee named Enaida Anderson ("Ms. Anderson") to apply for the position.  Upon information and belief, Mr. Khalifeh took steps to help Ms. Anderson get the position even though Ms. Anderson was not as qualified for the position.

27

Sabotage of IPT Meeting- January 16, 2020

186.    On January 6, 2020, Mr. Khalifeh instructed Ms. Laurent-Workman to send invites out for an IPT meeting that was scheduled for January 16, 2020.  She promptly did as she was instructed.

187.    What Mr. Khalifeh purposefully did not do, however, was inform Ms. Laurent-Workman that she was responsible for facilitating the meeting.  It was only on January 14, 2020 – just two days before the IPT meeting that Mr. Khalifeh informed her she would be responsible for facilitating the meeting.

188.    Ms. Laurent-Workman had to scramble and work non-stop to prepare for and facilitate the meeting, including forwarding read ahead slides to the Garrison command group on January 15, 2020, the day before the IPT meeting.  Usually, presentation for an IPT meeting can take weeks to prepare.

189.    On the day of the IPT meeting there were very few attendees, which was unusual for this type of meeting.

190.    After the meeting, Ms. Laurent-Workman ran into a male colleague in the hallway who relayed to her that Mr. Khalifeh had told several team members that the meeting was canceled when, in fact, it was not.

191.    Mr. Khalifeh's comments to team members in this regard were a direct attempt to suppress attendance at the meeting and make Ms. Laurent-Workman look incompetent to leadership for her role in facilitation the meeting.

192.    The Deputy Garrison Commander who attended the meeting actually admonished Mr. Laurent-Workman and stated that she needed to make a better effort to ensure participation.

193.    Similarly, around the same time frame on January 15, 2020, Mr. Khalifeh instructed Ms. Laurent-Workman to collect health promotion and working group slides for use in a meeting to take place on February 5, 2020.

194.    However, Mr. Khalifeh tasked her with collecting slides that were altogether incongruent with past formats, causing Ms. Laurent-Workman to have to work hastily to compile an additional slide that followed the proper format.

195.    Due to the truncated period in which to compile the new slides, the final product still contained some obsolete information, which caused the Deputy Garrison Commander to make a comment about the need for more uniform presentation of data.

196.    Insofar as Ms. Laurent-Workman put the slides together, she was made to appear incompetent and inept even though the issue was caused solely by the malfeasance of Mr. Khalifeh, who said nothing to defend Ms. Laurent-Workman and failed to explain his role in the failure.

<u>Ms. Castro Continues the Hostile Work Environment, Discrimination and Retaliation</u>

197.    On March 5, 2020, Ms. Laurent-Workman was informed that he had not been selected for the Community Readiness and Resilience Integrator/Employee Assistance Program Coordinator (EAPC), GS-0101-12.

198.  Mr. Khalifeh sabotaged Ms. Laurent-Workman's chances at being selected.

199.  Moreover, upon information and belief, in light of Mr. Khalifeh's regular communication with Ms. Castro, he had informed Ms. Castro about Ms. Laurent-Workman's protected activity.  Upon information and belief, Ms. Castro was swayed by her prior protected activity when she did not select Ms. Laurent-Workman.

200.  Even after Mr. Khalifeh transferred away from Benelux in mid- summer, 2020, Ms. Castro continued the harassment against Ms. Laurent-Workman.  Ms. Castro ordered Ms. Laurent-Workman to relocate to another office and demanded that she physically prepare and move boxes and other property even though it is not typical to have employees conduct moves and even though Ms. Laurent-Workman had been in a car accident and had sustained physical injuries.

201.  Ms. Laurent-Workman sought clarification on the move and other matters from Ms. Castro but she never responded to her.  In addition, Ms. Laurent-Workman sent documents to Ms. Castro for her signature, but Ms. Castro did not respond.

202.  The ongoing mistreatment and hostility, compounded by the years of torment by Mr. Khalifeh caused grievous harm to Ms. Laurent-Workman emotional and mental well-being.

203.  Collectively, Mr. Khalifeh, Ms. Adams, Mr. Thomas and Ms. Castro, engaged in unrelenting harassment and retaliation against Ms. Laurent-Workman in her performance by undermining her ability to do her job and to sabotage her work.

204.    On August 22, 2020, Ms. Laurent-Workman resigned her position from federal employment.

## COUNT ONE
## RACE/COLOR DISCRIMINATION- TITLE VII
### (Discrimination in the Terms and Conditions of Employment)

205.    Ms. Laurent-Workman incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

206.    At all times relevant to this Lawsuit and in this Complaint, Ms. Laurent-Workman was an "employee" and the Agency was an "employer" within the meaning of Title VII.

207.    The conduct as alleged throughout this Lawsuit and this Complaint constitutes discrimination and disparate treatment on the bases of Ms. Laurent-Workman's race/color (African American/Black) in violation of Title VII.  Alternatively, the conduct as alleged throughout this Lawsuit and this Complaint constitutes discrimination and disparate treatment on this basis of Ms. Laurent-Workman's race/color plus national original and/or gender.

WHEREFORE, Ms. Laurent-Workman demands judgment against Defendant and seeks the following relief:

A.    Economic damages;

B.    Compensatory damages;

C.    Prevailing party attorneys' fees, expenses, and costs;

D.    Pre and Post-Judgment interest; and

E.    Such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may permit.

## COUNT TWO
## NATIONAL ORIGIN DISCRIMINATION- TITLE VII
### (Discrimination in the Terms and Conditions of Employment)

208.    Ms. Laurent-Workman incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

209.    At all times relevant to this Lawsuit and in this Complaint, Ms. Laurent-Workman was an "employee" and the Agency was an "employer" within the meaning of Title VII.

210.    The conduct as alleged throughout this Lawsuit and this Complaint constitutes discrimination and disparate treatment on this basis of Ms. Laurent-Workman's national origin (Haitian descent) in violation of Title VII.  Alternatively, the conduct as alleged throughout this

31

Lawsuit and this Complaint constitutes discrimination and disparate treatment on this basis of

Ms. Laurent-Workman's national origin plus race/color and/or gender.

WHEREFORE, Ms. Laurent-Workman demands judgment against Defendant and seeks

the following relief:

A.   Economic damages;

B.   Compensatory damages;

C.   Prevailing party attorneys' fees, expenses, and costs;

D.   Pre and Post-Judgment interest; and

E.   Such other penalties and monetary, declaratory, and equitable relief as

the nature of her causes may permit.

## COUNT THREE
## GENDER DISCRIMINATION- TITLE VII
## (Discrimination in the Terms and Conditions of Employment)

211.   Ms. Laurent-Workman incorporates by reference all allegations and paragraphs

contained in the Complaint as if more fully set forth herein.

212.   At all times relevant to this Lawsuit and in this Complaint, Ms. Laurent-Workman

was an "employee" and the Agency was an "employer" within the meaning of Title VII.

213.   The conduct as alleged throughout this Lawsuit and this Complaint constitutes

discrimination and disparate treatment on the basis of Ms. Laurent-Workman's gender (female)

in violation of Title VII.  Alternatively, the conduct as alleged throughout this Lawsuit and this

Complaint constitutes discrimination and disparate treatment on this basis of Ms. Laurent-

Workman's gender plus race/color and/or national origin.

WHEREFORE, Ms. Laurent-Workman demands judgment against Defendant and seeks

the following relief:

32

A.      Economic damages;

B.      Compensatory damages;

C.      Prevailing party attorneys' fees, expenses, and costs;

D.      Pre and Post-Judgment interest; and

E.      Such other penalties and monetary, declaratory, and equitable relief as

the nature of her causes may permit.

**COUNT FOUR**
**RETALIATION- TITLE VII**
**(Retaliation in the Terms and Conditions of Employment)**

214.    Ms. Laurent-Workman incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

215.    At all times relevant to this Lawsuit, Ms. Laurent-Workman was an "employee" and the Agency was an "employer" within the meaning of Title VII.

216.    During the times specified in the Lawsuit and this Complaint, Ms. Laurent-Workman repeatedly engaged in protected activity by opposing, complaining and raising the Agency's illegal and discriminatory and harassing practices.

217.    Title VII makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices or participating in any investigation or proceeding.

218.    The Agency violated Ms. Laurent-Workman's right to equal employment opportunity by retaliating against Ms. Laurent-Workman by taking material adverse actions against her, repeatedly thwarting her professional career advancement, and otherwise engaging in actions designed to dissuade her from making or supporting complaint(s) and engaging in further protected activity, all of which caused Ms. Laurent-Workman economic damages and

ongoing emotional and psychological harm in violations of the anti-retaliation provisions of Title VII.

WHEREFORE, Ms. Laurent-Workman demands judgment against Defendant and seeks the following relief:

        A.      Economic damages;

        B.      Compensatory damages;

        C.      Prevailing party attorneys' fees, expenses, and costs;

        D.      Pre and Post-Judgment interest; and

        E.      Such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may permit.

**COUNT FIVE**
**HOSTILE WORKING ENVIRONMENT- TITLE VII**

219.    Ms. Laurent-Workman incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

220.    At all times relevant to this Lawsuit and in this Complaint, Ms. Laurent-Workman was an "employee" and the Agency was an "employer" within the meaning of Title VII.

221.    The conduct as alleged throughout this Lawsuit and in this Complaint constitutes unwelcome harassment on the bases of race/color and/or national origin and/or gender that was severe and pervasive, and that altered the conditions of her employment and created an abusive atmosphere.

222.    The Agency knew about the hostile work environment against Ms. Laurent-Workman because she repeatedly complained to management and engaged in protected activity such as filing an EEO complaints designed to cause an investigation to stop the offending conduct.

223.    These Agency failed to promptly address and remediate the harassment in question, resulting in retaliation against Ms. Laurent-Workman and an abusive work environment.

224.    The Agency violated Ms. Laurent-Workman's right to equal employment opportunity by allowing and failing to rectify a hostile work environment based on her race/color and/or national origin and/or gender in violation of Title VII, which environment became increasingly caustic and harmful, all the while causing Ms. Laurent-Workman ongoing emotional and psychological harm.

WHEREFORE, Ms. Laurent-Workman demands judgment against Defendant and seeks the following relief:

A.    Economic damages;

B.    Compensatory damages;

C.    Prevailing party attorneys' fees, expenses, and costs;

D.    Pre and Post-Judgment interest; and

E.    Such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may permit.

## COUNT SIX
## HOSTILE WORKING ENVIRONMENT RETALIATION- TITLE VII

225.    Ms. Laurent-Workman incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

226.    At all times relevant to this Lawsuit, Ms. Laurent-Workman was an "employee" and the Agency was an "employer" within the meaning of Title VII.

227.    The conduct as alleged throughout this Lawsuit and in this Complaint constitutes unwelcome harassment on the bases of race/color and/or national origin and/or gender that was

35

severe and pervasive, and that altered the conditions of her employment and created an abusive atmosphere.

228. The Agency knew about the hostile work environment against Ms. Laurent-Workman because she repeatedly complained to management and engaged in protected activity such as filing an EEO complaints designed to cause an investigation to stop the offending conduct.

229. These Agency failed to promptly address and remediate the harassment in question, resulting in retaliation against Ms. Laurent-Workman and an abusive work environment.

230. The Agency violated Ms. Laurent-Workman's right to equal employment opportunity by allowing and failing to rectify a hostile work environment based on retaliation in violation of Title VII, which environment became increasingly caustic and harmful, all the while causing Ms. Laurent-Workman ongoing emotional and psychological harm.

WHEREFORE, Ms. Laurent-Workman demands judgment against Defendant and seeks the following relief:

A. Economic damages;

B. Compensatory damages;

C. Prevailing party attorneys' fees, expenses, and costs;

D. Pre and Post-Judgment interest; and

E. Such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may permit.

## DEMAND FOR TRIAL BY JURY

Ms. Laurent-Workman demands a trial by jury.

Respectfully Submitted,

_____/s/_____
Paula M. Potoczak (VSB 23208)
Law Office of Paula M. Potoczak
218 North Lee Street, Third Floor
Alexandria, Virginia   22314
(703) 519-3733 (Telephone)
(703) 519-3827 (Facsimile)
Email:  pmplaw@earthlink.net

-And-

Ruth Ann Azeredo
1997 Annapolis Exchange Parkway
Suite 300
Annapolis, MD  21401
(410) 558-1915
(410) 558-1917 Fax
ruthazeredo@comcast.net
*Pro Hac Vice Admission Pending*

Date:  October 28, 2020