IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MARIE LAURENT-WORKMAN,　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiff,　　　　　　　)
　　　　v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　　Case No. 1:20-cv-01272-AJT-MSN
RYAN MCCARTHY,　　　　　　　　　　)
*Secretary, United States*　　　　　　　　　)
*Department of the Army*　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Defendant.　　　　　　)
_____)

## MEMORANDUM OPINION AND ORDER

Plaintiff Marie Laurent-Workman (the "Plaintiff" or "Laurent-Workman") has sued the United States Army for employment discrimination.[1] [Doc. No. 1] (the "Compl."); [Doc. No. 23]("Amend. Compl."). Defendant John E. Whitley (the "Defendant"), Acting Secretary of the United States Army, has filed a Motion to Dismiss for Failure to State a Claim. [Doc. No. 25] (the "Motion" or "Mot."). For the reasons stated below, the Motion is **GRANTED**.

## I.    BACKGROUND

The following facts, as alleged in the Complaint, are assumed true for purposes of the Motion.

### A.  Factual Background

The Army operates a substance abuse program ("ASAP") at the United States Army Benelux, located in Belgium ("USAG Benelux"), which is administered through the Army

---

[1] Plaintiff filed this action on October 28, 2020 [Doc. No. 1] and following Defendant's initial Motion to Dismiss [Doc. No. 12], filed an Amended Complaint on April 5, 2021 [Doc. No. 23], to which Defendant filed its pending Motion to Dismiss [Doc. No. 25] on April 16, 2021. A hearing was held on that Motion on May 12, 2021, following which the Court took the Motion under advisement.

Center for Substances Abuse Programs ("IMCOM ASAP").  Am. Compl.  ¶ 7-8.  From November 2017, through August 22, 2020, Plaintiff was stationed at USAG Benelux and working under the Army's Department of Human Resources as an ASAP Specialist and civilian employee.  *Id.* ¶¶ 8, 34-35, 225.  She identifies as African-American/Black, Haitian American, and female.  *Id.* ¶ 8.

When Plaintiff began working at USAG Benelux, her first line supervisor was ASAP Manager Jasser Khalifeh ("Khalifeh"), who is alleged to be "Brown, Caucasian of Jordanian descent, [and] male."  *Id.* ¶ 36.  Through July 2019, her second line supervisor was Acting Director of Human Resources Shun Thomas ("Thomas"), who is alleged to be "African-American/Black male," and beginning on July 7, 2019, her supervisor was the Director of Human Resources Yvette Castro ("Castro"), who is alleged to be "Caucasian/White, Hispanic, American, female."  *Id.* ¶¶ 36, 186.

Shortly after assuming the position of ASAP Specialist, Plaintiff was introduced to a co-worker named Dorothea Adams ("Adams"), who is alleged to be "Caucasian, Dutch, [and] female."  *Id.* ¶ 37.  Adams was placed at USAG Benelux through the Dutch Ministry of Defense, was supervised by Khalifeh under the ASAP Program, and initially worked as the Drug Testing Coordinator but was later given the additional title of ASAP Coordinator.  *Id.* ¶¶ 37-38.  Plaintiff and Adams worked in different duty locations, but their stated job descriptions and positions had overlapping responsibilities.  *Id.* ¶ 39.

As general background, Plaintiff alleges that "Ms. Adams was not pleased that [Plaintiff] had been hired and that her job was such that she would be handling matters Ms. Adams believed were hers to handle," "denigrate[d] her and repeatedly took actions to undermine [Plaintiff]'s work and reputation[]" and "[i]n short order, [] elevated what began as relatively minor incidents

of conflict into serious harassment and mistreatment, which were fueled by her racial animus against African Americans/Blacks." *Id.* ¶¶ 40, 41. Plaintiff further alleges that she complained to Khalifeh, Thomas, and Castro, who refused to address her complaints and then retaliated against her because of those complaints, including not selecting her for a vacant position she applied for. More specifically, stripped of its conclusory allegations and summary characterizations,[2] the 257 paragraph Amended Complaint alleges the following events:

1. "At an early point working together[,]" Adams "made a racially insensitive comment to [Plaintiff] and others that 'blacks cannot speak properly' and that [Adams] 'cannot understand them.'" *Id.* ¶ 42. Plaintiff complained to Khalifeh and Thomas several times about this comment and others, but they refused to investigate the complaints. *Id.* ¶ 45.

2. At a staff meeting on May 22, 2018, Khalifeh deferred to Adams' thoughts on Plaintiff's suggested recommendation to a work related problem. Adams "reacted angrily and accused [Plaintiff] of trying to take away her job." *Id.* ¶ 48. Khalifeh stated that the "matter [was] settled–Ms. Adams will continue with the collection." *Id.*

3. In June, 2018, Plaintiff scheduled a meeting with Khalifeh where she complained that he was displaying disparate and more favorable treatment towards Adams. *Id.* ¶ 52. Plaintiff also complained that she was afraid to speak to Adams because of her blatant hostility against her. *Id.* Khalifeh did not investigate and instead stated that because Adams was Dutch, she did not understand that her alleged behavior was harassing. *Id.* ¶ 54.

4. On June 7, 2018, Khalifeh denied without reason Plaintiff's request to attend a national suicide prevention conference, which Plaintiff alleges was without justification. *Id.* ¶ 49.

---

[2] *See, e.g.*, Am. Compl. ¶ 127 (Khalifeh engaged in "a blatant act of sabotage" on February 4, 2019); *id.* ¶ 223 ("The ongoing mistreatment and hostility, compounded by the years of torment by Mr. Khalifeh . . . .").

3

5. On July 23, 2018, Plaintiff asked Adams to provide a copy of a course agenda so that Plaintiff could prepare for teaching a class. *Id.* ¶ 55. Adams responded that she was to have nothing to do with "[Plaintiff]'s class" and refused to provide the agenda. *Id.* ¶ 56. During this exchange, Adams stated that "we do things differently than 'you people,'" a phrase Adams had used previously in describing other African-American/Black soldiers. *Id.* ¶ 59. Plaintiff reported the incident to Thomas, who stated that he "would address the situation upon Mr. Khalifeh's return from vacation." *Id.* ¶ 65. Neither Thomas or Khalifeh conducted an investigation. *Id.* ¶ 66.

6. On August 10, 2018, Khalifeh removed a quarter of Plaintiff's responsibilities as reflected on her position description and gave them to Adams, assigning to Adams primary responsibility and Plaintiff with secondary responsibility. However, Plaintiff's position and grade did not change. *Id.* ¶¶ 67-70.

7. On August 31, 2018, Plaintiff telephoned Thomas to discuss the unwarranted removal of her job responsibilities, her prior complaints, and management's failure to address her complaints. *Id.* ¶ 75. In response to Plaintiff's complaints, Thomas stated something to the effect of, "do you like your job?", with a tone that that was "not only dismissive of her complaint but overtly threatening her for having the audacity to raise complaints in the first instance[]" and "was a threat and was meant to dissuade [Plaintiff] from taking further actions to support her complaints." *Id.* ¶¶ 77, 78.

8. On September 5, 2018, Plaintiff witnessed Adams "disparaging the IMCOM ASAP Drug Testing Chief, an African-American/Black woman" by announcing that she was reporting to work under the influence of alcohol, which Plaintiff found inappropriate and reported the

4

incident to Khalifeh, who rather than investigate, instructed Plaintiff to not contact Adams. *Id.* ¶¶ 71-74.

9. In September, 2018, during a break in a suicide prevention event hosted at USAG Benelux and attended by ASAP leadership and other behavioral health professionals throughout the Army's European theatre, Khalifeh and others were discussing sports in her presence and Khalifeh interjected the issue of race into the discussion, particularly about black athletes, with "several statements with revolting racial animus, including his belief that 'the reason black male athletes excel is [sic] sports is because the slave masters had bred the strongest slaves together.'" *Id.* ¶¶ 79-81.

10. On September 24, 2018, Khalifeh issued a verbal reprimand to Plaintiff for coordinating program activities with the Brussels American School that Khalifeh suggested were Adams' responsibilities, not Plaintiff's. *Id.* ¶¶ 85-90. During this period, Khalifeh informed Plaintiff he had changed Adams' job title from Drug Testing Coordinator to Drug Testing Coordinator/ASAP Coordinator, although that job position and description did not exist. *Id.*

11. In early October 2018, Plaintiff again approached Thomas to report the ongoing hostile working environment and the ongoing reprisal by Khalifeh relating to Adams' change in title and responsibilities and Plaintiff's perception that her position had been "marginalized and minimized." *Id.* ¶¶ 91-92. She informed Thomas that Khalifeh was "subjecting her to hyper-scrutiny, castigating her without basis, and berating her." *Id.* ¶ 91. Thomas did not take any action and instead noted that issues were "not worthy of addressing." *Id.* ¶ 94.

12. On October 9, 2018, Plaintiff was "forced" to contact Thomas to request data from Adams needed for a presentation. *Id.* ¶ 95. Thomas "interrogated" Plaintiff as to the need for

the information rather than directing Adams to supply it, but after repeated requests, Thomas directed Adams to provide the information. *Id.* ¶¶ 96-97.

13. During a meeting on October 25, 2018 between Adams, Khalifeh, and Plaintiff, Plaintiff requested that Khalifeh forward her a copy of a checklist that he had emailed Adams. *Id.* ¶¶ 106-07. Khalifeh ordered Plaintiff to go outside the unit to obtain the checklist. *Id.*

14. On November 16, 2018, shortly after a meeting with Plaintiff's supervisors, Adams, and the Deputy Garrison Commander, Tom Joyce, during which Plaintiff demanded to clarify the duties of Plaintiff and Adams since Khalifeh had caused a "diminution of [Plaintiff]'s role and responsibilities" and given portions of Plaintiff's responsibilities to Adams, Adams became agitated and aggressive, mimicked Plaintiff's voice and speech patterns, pointed at Plaintiff aggressively, and referred to Plaintiff as "you people." Thomas was the only person to respond and attempted to redirect Adams to a different topic. *Id.* ¶¶ 98-103.

15. On November 28, 2018, Khalifeh formally denied Plaintiff's request to attend suicide prevention training in Germany because the federal budget had not yet been approved. *Id.* ¶¶ 110-13. This missed training placed Plaintiff in a "professional disadvantage and her career trajectory was affected." *Id.* ¶ 114.

16. On December 13, 2018, Adams forwarded an email to Plaintiff, copying Khalifeh, accusing Plaintiff of failing to teach or "skipp[ing]" an important prevention aspect from a manual. *Id.* ¶ 116. Khalifeh called Plaintiff and explained that Adams had simply been misunderstood. *Id.* ¶ 118. That same day, Plaintiff contacted the USAG Benelux Equal Opportunity Office ("EEO") office, initiating the informal EEO process, to address the "discriminatory and retaliatory treatment she had experienced." *Id.* ¶¶ 11, 120. Upon information and belief, both Khalifeh and Adams were made aware that Plaintiff was in the

6

process of filing a formal complaint of discrimination and reprisal, which identified both as respondents. *Id.* ¶ 122.

17. During a monthly meeting on December 13, 2018, Plaintiff was not able to present any risk-reduction data because Adams—who was tasked with collecting the risk-reduction data—had not compiled the necessary data. *Id.* ¶ 126. Adam's failure was then reflected in the monthly meeting minutes that were submitted for signature on January 7, 2019. *Id.*

18. On January 22, 2019, Plaintiff received her notice of right to file a formal complaint from the USAG Benelux EEO Office ("the Agency"). *Id.* ¶ 12.

19. On February 4, 2019, Mr. Khalifeh altered the minutes from the December 13, 2018 monthly meeting, removing any mention of Adams' "name and malfeasance," but leaving Plaintiff's "name in the minutes to make it appear as if it were her fault." *Id.* ¶ 127.

20. On February 6, 2019, Plaintiff submitted her first formal complaint with the Agency, wherein she included the matters she raised in her informal EEO complaint. *Id.* ¶ 13 ("First Formal Complaint")

21. On March 13, 2019, Khalifeh sent an email to all commanders stating that Plaintiff was the primary point of contact for military drug testing matters while Adams was on leave. *Id.* ¶¶ 132-137. Plaintiff informed Khalifeh that the additional duties not only violated regulations and policies, but that it also interfered with a separate job. *Id.* ¶ 137. Khalifeh ignored Plaintiff's concerns and required her to perform the additional duties. *Id.*

22. In May 2019, Plaintiff questioned whether she would be entitled to overtime for performing the additional duties and asked if her position would be re-evaluated for reclassification and possible promotion given that she was now performing multiple jobs. *Id.* ¶

142. Khalifeh removed the drug-testing element from her performance standards but informed her that she was still required to perform Adams' additional duties. *Id.* ¶ 143.

23. On June 23, 2019, Plaintiff filed a new informal complaint for conduct that had been ongoing and part of which had occurred within the previous seven days. *Id.* ¶ 17.

24. On July 15, 2019, the Agency extended the scope of the First Formal Complaint to include the events raised in the June 23, 2019 informal complaint. *Id.* ¶ 18.

25. In July of 2019, Castro assumed her position as the Director of Human Resources and Khalifeh "brought Ms. Castro her up-to-date on the status of [Plaintiff]'s EEO complaints." *Id.* ¶ 192.

26. In a mandatory team meeting on August 8, 2019, Khalifeh prevented Plaintiff from presenting her findings or power point presentation, which interfered with her tasked responsibilities. *Id.* ¶ 153. Khalifeh mentioned that the Garrison Commander was the individual who had discussed changing the meeting. *Id.* ¶ 154.

27. On or about August 27, 2019, Plaintiff requested to use several accumulated days of her annual leave during the Christmas holiday, specifically December 23, 2019 through December 27, 2019. *Id.* ¶ 158. Approximately one week later, on September 4, 2019, Plaintiff was informed that her leave had been denied because someone had to be physically in the office during the holidays, even though Adams and Khalifeh were given leave during that same period. *Id.* ¶¶ 158-59.

28. On September 10, 2019, Plaintiff filed a new informal EEO complaint with the Agency. *Id.* ¶¶ 20, 178.

29. During a monthly meeting on September 12, 2019, Khalifeh skipped over Plaintiff's "final thoughts" to prevent her from speaking in any fashion. *Id.* ¶¶ 163-66. Plaintiff attempted

to signal that she had information to share, at which point Khalifeh interrupted her and loudly stated "thank you everyone for coming," ending the meeting. *Id.* ¶ 166.

30. On September 20, 2019, Plaintiff received notification from the Defense Civilian Personnel Data System ("DCPDS") that her mid-year performance review had been completed, even though she had not met with Khalifeh for her current appraisal period or to discuss performance standards for that period. *Id.* ¶¶ 169-72.

31. From September 23, 2019 through October 1, 2019, Plaintiff was temporarily designated to act in Khalifeh's absence, but another member employee was chosen over her to attend a meeting. *Id.* ¶¶ 173-77.

32. On October 15, 2019, Plaintiff submitted a new informal EEO complaint addressing additional instances occurring from August 8, 2019 through September 23, 2019. *Id.* ¶ 23.

33. On October 19, 2019, Plaintiff submitted her second formal complaint to the Agency. *Id.* ¶ 21 ("Second Formal Complaint"). "Mr. Khalifeh and Ms. Adams were aware that Plaintiff had filed several complaints of discrimination and retaliation, including the second formal complaint of discrimination and reprisal." *Id.* ¶ 179.

34. On or about November of 2019, a vacancy for the Community Readiness and Resilience Integrator/Employee Assistance Program Coordinator position was announced, which Plaintiff was interested in (the "vacant position"). *Id.* ¶¶ 185, 197. Castro ,who is "Caucasian/White, Hispanic, American, female" was the selecting official for the vacant position. *Id.* ¶¶ 186-87.

35. On December 2, 2019, Khalifeh sent an email to Castro that was accidentally also sent to Plaintiff, which "mocked [Plaintiff's] interest and qualifications for the position, stating in part, '[v]ery interesting, all of the sudden she is tracking CR2C events that she had no interest

9

in earlier.'"  *Id.* ¶¶ 198, 200.  That same day, Plaintiff added an additional incident to her new informal EEO complaint.  *Id.* ¶ 24.  On or about December 6, 2020, Plaintiff applied for the vacant position.  *Id.* ¶¶ 202-03.

36. On January 6, 2020, Khalifeh instructed Plaintiff to send invitations out for an IPT meeting that was scheduled for January 16, 2020.  However, he did not tell her that she was also responsible for facilitating the meeting until two days before the meeting.  *Id.* ¶¶ 207-13.  After the meeting, a co-worker informed Plaintiff that Khalifeh had told other employees that the meeting had been cancelled, when it had not, to decrease the number of attendees.  *Id.*  The Deputy Garrison Commander who attended the meeting admonished Plaintiff and stated that she needed to make a better effort to ensure participation.  *Id.*

37. On January 15, 2020, Khalifeh instructed Plaintiff to collect health promotion and working group slides for use in a meeting to take place on February 5, 2020.  *Id.* ¶ 214.  However, Khalifeh tasked her with collecting slides that were altogether incongruent with past formats, causing Plaintiff to have to work hastily to compile an additional slide that followed the proper format.  *Id.* ¶ 215.  Due to the truncated period in which to compile the new slides, the final product still contained some obsolete information, which caused the Deputy Garrison Commander to make a comment about the need for more uniform presentation of data.  *Id.* ¶ 216.

38. On February 7, 2020, Plaintiff was interviewed for the vacant position and scored by an interview panel, consisting of Castro and two male members.  *Id.* ¶¶ 202-03.  One panelist gave Plaintiff a total score of 37, whereas Castro scored Plaintiff at 28.  *Id.* ¶¶ 204-05.

39. On March 5, 2020, Plaintiff was informed that she was not selected for the vacant position.  *Id.* ¶¶ 203, 218.

40. On April 9, 2020, Plaintiff submitted a new informal complaint with the Agency for conduct occurring from December 2, 2019 through March 5, 2020. *Id.* ¶ 26.

41. On April 17, 2020, the Agency issued an amendment to the Second Formal Complaint extending its scope to include the additional conduct submitted by Plaintiff for the period beginning on December 2, 2019 through March 5, 202, including Plaintiff's non-selection. *Id.* ¶ 27.

42. The Agency retained an outside vendor to perform an administrative investigation into the Second Formal Complaint and a Report of Investigation. *Id.* ¶ 28.

43. Plaintiff, at her request, received a Final Agency Decision on her First Formal Complaint (filed on February 6, 2019) on August 13, 2020 and a Final Agency Decision on her Second Formal Complaint (filed on October 19, 2019) on July 31, 2020. *Id.* ¶¶ 29-30.

44. In mid-summer 2020, after Khalifeh had transferred away from Benelux, Castro ordered Plaintiff to relocate to another office and demanded that she physically prepare and move boxes and other property even though it was not typical to have employees conduct moves and even though Plaintiff had been in a car accident and had sustained physical injuries. *Id.* ¶ 221.

45. On August 22, 2020, Plaintiff resigned her position from federal employment. *Id.* ¶ 225.

46. "[U]pon information and belief, considering Mr. Khalifeh's regular communication with Ms. Castro, he had informed Ms. Castro about [Plaintiff's] protected activity[,]" *id.* ¶ 220; and "[t]hose working in the Directorate of Human Resources and the ASAP program regular [sic] regularly shared information on employees matters, including any complaints and Mr. Khalifeh communicated with Ms. Castro about [Plaintiff]," *id.* ¶ 190.

Based on the above events, Plaintiff alleges that the cumulative effect of Adams' behavior and the campaign of harassment and retaliation by Khalifeh caused her "to suffer both physical and mental health problems, including anguish, anxiety, insomnia, and increased migraines." *Id.* ¶ 180. She was "often afraid to speak at work, come to work, interact with Mr. Khalifa and was in a constant state of walking on proverbial 'egg shells.'" *Id.* ¶ 181. On many days she would take her break and go to her car to cry. *Id.* ¶ 182. And she developed "a severe and exacerbated migraine condition and is on prescription medication for anxiety among other ailments, all of which are directly and causally related to the work environment she experienced." *Id.* ¶ 183.

On October 28, 2020, Plaintiff filed this action and in her Amended Complaint [Doc. No. 23], asserts the following claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 2000e- 16(c) and 29 C.F.R. § 1614.407 (collectively, "Title VII"):

     a. race/color discrimination (Count I);

     b. national origin discrimination (Count II);

     c. gender discrimination (Count III);

     d. retaliation (Count IV);

     e. hostile working environment (Count V); and

     f. hostile working environment retaliation (Count VI).

*See generally* Am. Compl. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 42 U.S.C. § 2000e-5(3). The parties do not dispute that Plaintiff has exhausted all of her administrative remedies as required. Am. Compl. at 4-5; *see* [Doc. No. 26] (the "Memorandum" or "Mem.") at 6-7.

## II.    LEGAL STANDARD

A motion pursuant to Federal Rule of Civil Procedure 12(b)(6) is an assertion by a

defendant that, even if the facts alleged by the plaintiff are true, the complaint fails as a matter of

law "to state a claim upon which relief can be granted."  Thus, a claim should be dismissed only

"if, after accepting all well-pleaded allegations in the plaintiff's complaint as true" and

construing the complaint liberally in favor of the plaintiff, "it appears certain that the plaintiff

cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of

Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

In addition, unless otherwise required, a motion to dismiss must be assessed in light of

Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim

showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8; *ACMA USA, Inc. v. Surefil, LLC*,

2008 WL 11378791 at *1 (E.D. Va. May 23, 2008).  However, while Rule 8 does not require

"detailed factual allegations," a plaintiff must still provide "more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544 (2007) (the complaint "must be enough to raise a right to relief above the

speculative level" to one that is "plausible on its face").

## III.    ANALYSIS

### A. Race/Color, National Origin, and Gender Discrimination (Counts I-III)[3]

Plaintiff claims that she was not selected for the vacant position because of her

"race/color (African-American/Black)" or, alternatively, on the basis of her "race/color plus

---

[3] Plaintiff does not identify in her Amended Complaint the particular adverse employment actions relied upon as the basis for her claims in Counts I-VI.  Nevertheless, as clarified at the hearing, the Court understands Plaintiff to rely on her non-selection as the basis for her discrimination claims in Counts I, II and III and her claim in Count IV that she was retaliated against based on her protected activity; and that she relies on the alleged hostile working environment as the basis for her discrimination claim in Count V and her claim in Count VI that she was retaliated against based on her race, gender, or national origin.

national origin and/or gender," Am. Compl. at ¶ 229 (Count I); or her "national origin (Haitian descent)" or, alternatively, "national origin plus race/color and/or gender"(Count II), *id.* at ¶ 233, or her "gender (female)," or alternatively, "gender plus race/color and/or national origin" (Count III), *id.* at ¶ 237.

In the context of a Title VII case, "an employment discrimination plaintiff need not plead a prima facie case of discrimination" to survive a motion to dismiss. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002). Instead, a Title VII plaintiff is "required to allege facts to satisfy the elements of a cause of action created by that statute." *McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015) *cert. denied*, 136 S. Ct. 1162 (2016). And in that regard, the pertinent statute, Title VII, prohibits an employer from "discharg[ing] any individual, or [ ] otherwise discriminat[ing] against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Nevertheless, in assessing whether the Plaintiff has alleged facts that plausibly state a claim for a Title VII violation "above a speculative level," *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) *aff'd*, 566 U.S. 30 (2012) (quoting *Twombly*, 550 U.S. at 555); *see also McCleary-Evans*, 780 F.3d at 585–86, the Court is guided by the requirements for establishing a prima facie case with respect to the conduct for which relief is requested. *Craft v. Fairfax County Government*, 2016 WL 1643433, at *4 (E.D. Va. Apr. 26, 2016) (citing *Coleman,* 636 F.3d at 190). Here, the elements of a prima facie case for discriminatory failure to promote are (1) that she is a member of a protected group, (2) she applied for the position in question, (3) she was qualified for the position, and (4) she was rejected for the position under

circumstances giving rise to an inference of unlawful discrimination. *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994).

Plaintiff does not allege how the duties, responsibilities, and benefits of that vacant position compared to her then existing position. Nevertheless, the Court will assume from the alleged competitive selection process that her non-selection constituted an adverse employment practice. And while her allegations that she applied for the vacant position and was not selected by individuals of different races, genders or national origins are necessary allegations, they are, by themselves, insufficient to plausibly allege that she was not selected because of her race, gender, or national origin. *See, e.g., McCleary-Evans*, 780 F.3d at 586 ("While the allegation that non-Black decisionmakers hired non-Black applicants instead of the plaintiff is consistent with discrimination, it does not alone support a reasonable inference that the decisionmakers were motivated by bias."); *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020) ("[G]uessing that conduct is racially motivated does not amount to pleading actual facts to support a claim of racial discrimination."). The Court has therefore, of necessity, considered whether a reasonable inference of unlawful discrimination can be inferred from the other alleged facts and circumstances in the Amended Complaint.

At the most basic level, Plaintiff does not allege the race/color, national origin, or gender of the individual selected for the vacant position or how her qualifications compared with the person selected. *See Alvarado v. Board of Trustees of Montgomery Community College*, 928 F.2d 118, 121 (4th Cir. 1991) (a plaintiff must demonstrate that he or she "was rejected for the position in question in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination."); *see also Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 760 (4th Cir. 1998) (promotion); *Weathers v. University*

*of North Carolina at Chapel Hill*, 477 F. App'x 508, 510 (4th Cir. 2011) (promotion); *Williams v. Henderson*, 129 F. App'x 806, 813 (4th Cir. 2005) (promotion); *Andrews v. Bell*, 1999 WL 1037602, at *1 (4th Cir. Nov. 16, 1999) (hiring); *Kebede v. Radisson Mark Plaza Hotel*, 1995 WL 134435, at *1 (4th Cir. March 29, 1995) (dismissal affirmed where Plaintiff admitted that the man who received the promotion was also a member of a protected class."); *King v. Virginia Employment Comm'n*, 1994 WL 416439, at *5-*6 (4th Cir. August 10, 1994) (no prima facie case with regard to gender and race discrimination in three disputed promotions, because the successful candidates, like the plaintiff, were women and black). Nevertheless, Plaintiff simply contends that despite the lack of allegations concerning who was promoted, a reasonable inference of discrimination can be drawn at this motion to dismiss stage from the other facts and circumstances surrounding her non-selection. But the facts and circumstances alleged do not otherwise plausibly allege that she was not promoted because of discrimination. There are no allegations of any statements by Castro or the other two panelist reflective of discriminatory animus; and her gender discrimination claim is substantially weakened by the sex of Castro, the "selecting official," as well as the ratings of the other male panelists who rated Plaintiff higher than Castro. *Orgain v. City of Salisbury*, 305 F. App'x 90, 103 (4th Cir. 2008) (the sex of the decision maker "substantially weakens any inference of discrimination . . . [when] a decision-maker is a member of the same protected class as the plaintiff.") (citing *Neely v. United States Postal Serv.*, 2007 WL 4389473, at *8 n.4 (E.D. Pa. Dec.12, 2007)); *see also Green v. Sessions*, 2018 WL 2025299, at *9 (E.D. Va. May 1, 2018), *aff'd*, 744 F. App'x 802 (4th Cir. 2018) (dismissing discrimination claims in part because the alleged discriminator "is in the same gender- and age-protected classes as [the plaintiff]"); *Taylor v. CNA Corp.*, 782 F. Supp. 2d 182, 198 (E.D. Va. 2010). Moreover, while Castro's rating is alleged to be relatively low compared

to the other two panelists' ratings, there are no allegations from which to infer how Plaintiff's ratings and demographics compared to the other candidates or the person selected. Nor can any inference of discriminatory animus on Castro's part be reasonably inferred, as Plaintiff appears to contend, from the alleged relationship between Castro and Khalifeh or Khalifeh's statements to Castro questioning Plaintiff's interest in the vacant position or expressing his view on whether he would rehire her. *See, e.g., Hawkins v. PepsiCo., Inc.*, 203 F.3d 274, 276 (4th Cir. 2000) ("[W]e refuse to transmute such ordinary workplace disagreements between individuals of different races into actionable race discrimination"). Indeed, Plaintiff does not even allege why she was qualified for the position, only that her supervisor Khalifeh questioned her qualifications for and interest in the position. *See generally* Am. Compl. ¶¶ 185-205. In short, Plaintiff has failed to allege facts and circumstances sufficient to reasonably infer that she was not selected because of her race, gender or national origin.

For all of the above reasons, Plaintiff has failed to state a claim for discrimination in Counts I, II, and III.

### B. Retaliation (Count IV)

In Count IV, Plaintiff alleges that she was not selected for the vacant position in retaliation for her protected activity. To state a claim for retaliation based on protected activity, a plaintiff must plausibly allege that (1) she "engaged in a protected activity;" (2) "the employer acted adversely against" her; and (3) "a causal connection between the protected activity and the asserted adverse action." *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008).

In summary, Plaintiff alleges that she engaged in the following protected activity:

1. A meeting with Khalifeh in June, 2018, to complain about him "displaying disparate and more favorable treatment towards Ms. Adams[,]" Am. Compl. ¶¶ 52-53;

2. A meeting with Thomas sometime after July 23, 2018, to complain about "being harassed by Ms. Adams" and to "underscore[] that her prior complaints had been ignored and, because of that, her working conditions remained hostile due to Ms. Adams [sic] actions and management's inaction[,]" *id.* ¶¶ 63-64;

3. A telephone call with Thomas on August 31, 2018, "to discuss the unwarranted removal of her job responsibilities, her prior complaints, and management's failure to address her complaints[,]" *id.* ¶¶ 75-76;

4. A meeting with Thomas in early October, 2018, during which she reported "the ongoing hostile working environment and the ongoing reprisal by Mr. Khalifeh" which "subject[ed] her to hyper-scrutiny, castigating her without basis, and berating her[]" and "that she was 'fighting' to do her job, and that her position had been marginalized and minimized within the Unit and ASAP[,]" *id.* ¶¶ 91-93;

5. A meeting on December 13, 2018 with an EEO counsel "to initiate a complaint of discrimination and reprisal for the discriminatory, harassing, and retaliatory conduct she had experienced to that point[,]" *id.* ¶¶ 120-21;

6. Her filing on February 6, 2019 her First Formal Complaint with the Agency, *id.* ¶¶ 129-30;

7 Her filing on June 23, 2019 an informal EEO complaint with the Agency for "conduct that had been ongoing and part of which had occurred within the previous seven days[,]" which by Agency action on July 15, 2019 extended the scope of the First Formal Complaint, *id.* ¶¶ 17-18.

8. Her filing on September 19, 2019 an informal EEO complaint with the Agency, *id.* ¶ 178;

9. Her filing on October 15, 2019 a new informal complaint addressing "additional instances occurring from August 8, 2019 through September 23, 2019," which by Agency action on January 27, 2020 amended the Second Formal Complaint, *id.* ¶¶ 23, 25;

10. Her filing on October 19, 2019 her Second Formal Complaint, *id.* ¶ 22;

11. Her filing a new informal complaint on December 2, 2019, which "added an additional incident . . . which had occurred on that same day[,]" *id.* ¶ 24;

12. Her filing of a new informal complaint on April 9, 2020 "for conduct occurring from December 2, 2019 through March 5, 2020[,]" which by Agency action on April 17, 2020 extended the scope of her Second Formal Complaint, *id.* ¶¶ 26-27.

As discussed above, the Court assumes that Plaintiff has adequately alleged that her non-selection constituted an adverse employment action; and she has clearly alleged that she engaged in protected activity. The issue is whether she has adequately alleged a causal relationship between her protected activity and her non-selection.

In order to establish causation, a plaintiff must establish that the decision-maker with respect to an adverse employment action acted with knowledge of plaintiff's protected activity and with that knowledge subjected that plaintiff to an adverse employment action because of her protected activity. *See Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir. 1998) ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case.") (citing *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 267 (5th Cir. 1994)); *see also Gregory v. City of Virginia Beach,* 428 F.Supp.2d 422, 432 (E.D. Va. 2006) ("To establish a causal link between

the protected activity and the adverse employment action, the decision-maker must have
knowledge of the employee's protected activity.").

Plaintiff does not allege any direct knowledge of her protected activity on the part of
Castro; and Plaintiff's causation allegations revolve around the alleged knowledge of Khalifeh
and Khalifeh's presumed transmission of his knowledge to Castro, much of which in conclusory
fashion, and her conclusory allegation that Castro would have known about her protected activity
because of her position as Director of Human Resources and her relationship with Khalifeh. *See
id.* ¶¶ 190-95; 220.  But even accepting Plaintiff's conclusory allegations that Castro knew what
Khalifeh knew about her protected activity, at best, Plaintiff has alleged knowledge on the part of
Khalifeh only as to the First Formal Complaint and related amendments, the latest of which was
September 19, 2019.  There are no alleged facts from which to infer that Khalifeh knew about
the Second Formal Complaint or its related informal complaints that became amendments to it.
In fact, Plaintiff explicitly alleges that Khalifeh had knowledge of her protected activity only
"insofar as he provided a sworn declaration in connection with the Agency's EEO investigations
on July 3, 2019[,] . . . August 17, 2019[,] . . . and again on September 16, 2019," Am. Compl. ¶¶
193-94, all of which necessarily related to her First Formal Complaint, since her Second Formal
Complaint was not filed until October 19, 2019 and the three informal complaints that became
amendments to the Second Formal Complaint on April 17, 2020 were filed on October 15, 2019,
December 2, 2019, and April 9, 2020.  There are no allegations that Castro was otherwise
informed of, responded to, or requested to respond to, those filings.  Nor can it be reasonably
inferred simply from her position that when she did not select Plaintiff, Castro knew about her
Second Formal Complaint (filed on October 19, 2019) or the informal complaint filed on
December 2, 2019.  As a result, Plaintiff has failed to adequately allege facts from which to

reasonably infer that Castro had knowledge of Plaintiff's protected activity after September, 2019; and therefore has failed to plausibly allege causation based on the temporal proximity between her last known protected activity and her non-selection sometime following her interview on February 7, 2020.

In any event, even assuming that Castro somehow had knowledge of all of Plaintiff's protected activity, there existed a lapse of, at least, more than two and as much as over three months between her last protected activity on December 2, 2019 and her non-selection; and no causal relationship between Plaintiff's protected activity and her non-selection can be reasonably inferred based on that temporal proximity. *See, e.g., Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) (holding that "a lapse of two months between the protected activity and the adverse action is 'sufficiently long so as to weaken significantly the inference of causation.'" (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)); *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (three months insufficient). This two to three month lapse is particularly lacking in probative value relative to causality given the marginal, informal nature of the December 2, 2019 protected activity, the lack of any allegations concerning her own qualifications for the position or those of the selected applicant, and importantly, her own allegation that her non-selection was caused by Khalifeh's disparaging remarks to Castro concerning her qualifications, which "sabotaged [Plaintiff's] chances of being selected." Am. Compl. ¶ 219; *see also id.* ¶¶ 198-200, 202; *Yao v. Visa, Inc.*, 2009 WL 3734178, at *6 (E.D. Va. Nov. 5, 2009), *aff'd sub nom. Xiaoping Yao v. Visa Inc.*, 370 F. App'x 385 (4th Cir. 2010) (holding that when a "two month gap" between the protected activity and the adverse action "is coupled with other evidence[,] . . . there is little on which this Court can infer a connection between the EEOC charge and the [adverse action].").

### C. Hostile Working Environment (Counts V and VI)

In Count V, Plaintiff alleges that from June, 2018 through August 22, 2020, she was subjected to a hostile work environment because of her race/color, gender and/or national origin in violation of Title VII; and in Count VI, she claims that during that same period she was also subjected to a hostile work environment because of her protected activity. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000-2(a)(1). Because "an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 207 (4th Cir. 2014) (citation omitted).

A hostile work environment claim requires conduct that (1) was unwelcome, (2) was based on a protected status (such as gender, race, or national origin), (3) was sufficiently severe or pervasive, and (4) can be attributed to the employer. *See Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). While the first element is subjective, the rest of the test is made up of objective components based on a "reasonable person" standard. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

Plaintiff has adequately alleged that she experienced a working environment that was subjectively unwelcome. She has failed as a matter of law, however, to allege facts and circumstances that make plausible that this unwelcome work environment was either sufficiently severe or pervasive to be actionable or existed because of her race, gender or national origin.

In assessing whether working conditions constitute an actionable hostile working environment for the purposes of Title VII, courts recognize that "[w]orkplaces are not always

22

harmonious locales," and Title VII does not operate as a "general civility code." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008). Rather, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the [] employment." *Harris*, 510 U.S. at 21; *Roberts v. Fairfax Cty. Public Schs.*, 858 F. Supp. 2d 605, 610 (E.D. Va. 2012). In that regard, the Fourth Circuit recently emphasized that "[i]t is not enough for a plaintiff to demonstrate that (1) there was racism in the workplace and (2) the workplace was also hostile. Instead, to present an actionable hostile work environment claim, the work environment must be *racially* hostile." *Irani v. Palmetto Health*, 767 F. App'x 399, 417 (4th Cir. 2019) (emphasis in original). When analyzing this element, courts examine the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct and its severity; whether it is physically threatening or humiliating or merely constitutes offensive verbal statements; and whether it unreasonably interferes with an employee's work performance. *See Harris*, 510 U.S. at 23; *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996); *see also Sunbelt Rentals, Inc.*, 521 F.3d at 315–16 (stating that complaints "that would objectively give rise to bruised or wounded feelings" or incidents that are "premised on nothing more than 'rude treatment by [coworkers],' 'callous behavior by [one's] superiors,' or a 'routine difference of opinion and personality conflict'" will not satisfy the severe or pervasive standard) (internal citations omitted and alterations in original).

The Amended Complaint does not present any facts that plausibly allege that her work environment was hostile based upon her gender or national origin. Rather, her hostile working environment claim is based on several race based comments by Adams, the last of which is alleged to have occurred on November 16, 2018, and by Khalifeh on one occasion in September,

23

2018, together with the indifference to her treatment exhibited by Khalifeh, her "first line" supervisor, and Thomas, an African-American, her "second line" supervisor, all of which undermined her authority.

Courts have uniformly rejected as sufficient to establish a hostile working environment the types of personnel actions, reviews, workplace conflicts and work assignments Plaintiff has alleged.[4] *See, e.g., Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997) (holding that less preferable work assignments, exclusion from meetings, and being ignored are not adverse actions); *Green*, 2018 WL 2025299, at \*9 (undermining plaintiff's authority, condescending behavior, refusing to address complaints about coworkers, increased workload, cancellation of meetings, and office moves are not adverse actions); *Lewis v. City of Va. Beach*, 2016 WL 4766515, at \*8, 11 (E.D. Va. Sept. 12, 2016) (work criticisms, job assignments, and comments plaintiff found offensive are not adverse actions); *Michael v. Va. Commonwealth Univ.*, 2018 WL 3631888 at \*2 (E.D. Va. July 31, 2018) (excessive work, communication methods, work criticisms, denial of request to attend conference, and ignored leave request are not adverse actions); *Taylor v. Republic Servs., Inc.*, 2013 WL 487042, at \*6 (E.D. Va. Feb. 6, 2013) ("undue scrutiny," work criticisms, undermined authority, and travel restrictions are not adverse actions).

Courts have also uniformly found insufficient to establish a racially hostile work environment the types of occasional crude, rude and offensive racial comments Plaintiff has

---

[4] In summary, the personnel actions and encounters Plaintiff alleges created a hostile working environment include: (1) her supervisor dismissed her suggestions on two occasions, Am. Compl. ¶¶ 46-47, 138; (2) that Adams, Khalifeh, and Thomas were rude to her on multiple occasions; (3) her supervisor dismissed her suggestions on two occasions, *id.* ¶¶ 46-47, 138; (4) she was subjected to a training decision she disagreed with, *id.* ¶¶ 49-51, 110; (5) her supervisor twice defended Adams, *id.* ¶¶ 116-19; (6) her meeting minutes were revised once, *id.* ¶ 127; (7) she had her duties reassigned to Adams, *id.* ¶¶ 98-101; (8) she had additional duties assigned to her in Adams' absence, *id.* ¶ 133; (9) she was on one occasion denied annual leave, *id.* ¶¶ 158-59; (10) she was prevented from attending and presenting at two meetings, *id.* ¶¶ 153, 165-66, 175; (11) her mid-year review was untimely, *id.* ¶ 169-70; and (12) she was given short notice of two projects, *id.* ¶¶ 208-09, 214-16.

24

alleged.[5] *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986) ("'[The] mere utterance of

an ethnic or racial epithet which engenders offensive feelings in an employee' [does] not affect

the conditions of employment to [such a] sufficiently significant degree [as] to violate Title

VII.") (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971)).[6] As the Court observed in

*Cox v. Rumsfeld*, 369 F. Supp. 2d 748, 758–59 (E.D. Va. 2005), *aff'd*, 190 F. App'x 329 (4th Cir.

2006), "[t]he Supreme Court, the Fourth Circuit and this Court have recognized hostile work

---

[5] By way of summary, Plaintiff alleges the following race based comments, the last of which occurred in November, 2018: (1) "at an early point working together," Adams stated that "blacks cannot speak properly" and she "cannot understand them," *id.* ¶¶ 42; (2) on July 23, 2018, Adams stated "this is NATO, we do things differently than 'you people'" and "[o]n several prior occasions . . . referred to African-Americans/Black soldiers as 'these people,'" that "she could not understand African-Americans/Blacks during a Unit Prevention leaders' class and that it irritated her to hear 'them' speaking," *id.* ¶¶ 59-60; (3) on September 5, 2018, Adams "disparage[ed] . . . an African-American/Black woman . . . by announc[ing] . . . that [she had] report[ed] to work under the influence of alcohol," *id.* ¶ 71; (4) in September 2018, Khalifeh stated in her presence that the reason for black excellence in sports was due to the selective breeding of slaves, *id.* ¶¶ 79-81; and (5) shortly after a meeting on November 16, 2018, Adams "mimicked [Plaintiff]'s voice and speech patterns" and referred to her as "you people," *id.* ¶ 102.

[6] *See also Sorto v. AutoZone, Inc.*, 821 F. App'x 188, 190–91 (4th Cir. 2020) (insufficient that plaintiff's supervisors and coworkers called him "a Latino," "a Mexican," commented "I know how all you Latinos are," implied that Latinos are untrustworthy, stated that "only Mexican females have long hair," and yelled Spanish slang to him); *Hartsell v. Duplex Prod., Inc.*, 123 F.3d 766, 772-73 (4th Cir. 1997) (defendant's statement that "[w]e've made every female in this office cry like a baby" and isolated references to plaintiff as a slave and comments about buxom magazine pictures were "mildly offensive (and unactionable) utterances"); *Belton v. City of Charlotte*, 175 F. App'x 641, 656 (4th Cir. 2006) (a few racially discriminatory incidents were temporally removed and not sufficiently severe or pervasive to be actionable); *Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 768–69 (4th Cir. 1997) (affirming dismissal of claim based on six derogatory comments about plaintiff's gender over a three-month period); *see also Montano v. INOVA Health Care Servs.*, 2008 WL 4905982, at *3-4 (E.D. Va. Nov. 12, 2008) (five insulting comments about illegal immigration, welfare, and other racial stereotypes insufficient); *Peary v. Goss*, 365 F. Supp. 2d 713, 727–28 (E.D. Va. 2005), *aff'd*, 180 F. App'x 476 (4th Cir. 2006) (finding that the episodes of daily hostility plaintiff experienced—i.e. "failing to greet [plaintiff] or lift his head from papers when he spoke to her" and "[defendant's] repeated description of host-country liaison personnel as 'goddamn gerbils'"— may be "unprofessional," it was too "mild," "hardly severe," and "not sufficiently severe and pervasive to be actionable under Title VII."); *Murphy v. Danzig, 64 F. Supp.* 2d 519, 522 (E.D.N.C. 1999) (comments to the effect of "you're black" and "you people" failed to state hostile work environment claim); *Taylor v. Va. Dept. of Corrections*, 177 F.Supp.2d 497, 502–03 (E.D. Va. 2001) (supervisor's "base" behavior during the course of a year, including a handful of derogatory remarks about African Americans and comments that "[b]lacks have too many special rights" and could not be fired, was not sufficiently frequent or severe to create a hostile work environment); *Mustafa v. Iancu*, 313 F. Supp. 3d 684, 695 (E.D. Va. 2018) ("[A] handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage.") (quoting *Baskerville v. Culligan Internat'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995)); *cf. Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 186 (4th Cir. 2001) (sufficient that employer constantly referred to African Americans as "monkeys" and "niggers," a term that the court deemed "[f]ar more than a 'mere offensive utterance,' . . . [and] pure anathema to African–Americans"); *Savage v. Maryland*, 896 F.3d 260, 277 (4th Cir. 2018) ("Likewise, an employer's repeated and continuous use of that slur, among others, to insult African–American employees and customers, even when not directed specifically at the complaining employee, is 'sufficiently severe or pervasive (or both)' to create an unlawful hostile work environment.").

environment claims when plaintiffs have presented evidence of daily and highly offensive treatment . . . emphasiz[ing], however, that 'Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace' and have granted summary judgment in favor of defendants even when the alleged conduct clearly was inappropriate in some regard") (collecting cases). And in *Mustafa*, the Court observed with respect to the "you people" comment by a supervisor that "the Fourth Circuit has made clear that an 'insulting or demeaning remark does not create a federal cause of action . . . merely because the 'victim' of the remark happens to belong to a class protected by Title VII[]'" and that "the Fourth Circuit has distinguished between 'mere offensive utterances' and comments that are 'physically threatening or humiliating.'" *Mustafa*, 313 F. Supp. at 696 (internal citations omitted).

Plaintiff's claim of a racially hostile environment during the period June, 2018 through August 22, 2020 is also undermined by the limited and sporadic nature of those comments (the last occurring in November, 2018), that all but one were made, not by a supervisor, but by a co-worker, Adams, who "worked in different duty locations," *id.* at ¶ 39, some were not directed to Plaintiff personally (such as Khalifeh's statement about the slave breeding), none of the complained of personnel actions were an "adverse action" for the purposes of Title VII or were related in substance to Plaintiff's race, gender or national origin, the race based comments were distant in time from many of the personnel actions complained about, and that despite experiencing physical and mental health problems, *id.* ¶¶ 180-83, there are no alleged instances of actual physical force directed against her.[7] In sum, Plaintiff's allegations do not plausibly

---

[7] Closest in that regard are the conclusory allegations that (1) on May 22, 2018, Adams "reacted angrily" to Plaintiff's suggestion at a meeting, *id.* ¶¶ 46-48; (2) on July 23, 2018, Adams "reacted in a hostile and aggressive manner" and "erupted in anger" to Plaintiff's request for a copy of a course agenda, *id.* ¶¶ 55-59; (3) on August 31, 2018, Thomas, in a telephone call with Plaintiff, in response to Plaintiff's on-going complaints about the unwarranted removal of job responsibilities, her prior complaints and management's failure to address them, "callously retorted something to the effect, 'do you like your job?,'" with a "statement and tone" that was not only "dismissive," but "overtly threatening her for having the audacity to raise complaints in the first instance," *id.* ¶¶ 77-

allege "an employment atmosphere that is permeated with discriminatory intimidation, ridicule and insult." *Sunbelt Rentals, Inc*. 521 F.3d at 315 (internal quotations omitted).

For these reasons, Plaintiff has failed to plausibly allege a discriminatory hostile working environment in violation of Title VII to support her claims in Counts V and VI.[8]

## IV.   CONCLUSION

Accordingly, for the foregoing reasons, it is hereby

ORDERED that Defendant's Motion to Dismiss for Failure to State a Claim [Doc. No. 25] be, and the same hereby is, **GRANTED**; and this action is **DISMISSED.**

The Clerk is directed to forward a copy of this Order to all counsel of record.

_____ /s/

Anthony J. Trenga
United States District Court

Alexandria, Virginia
June 11, 2021

---

78; and (4) at a November 16, 2018 meeting, Adams "became agitated and aggressive," referring to Plaintiff as "you people," in response to Plaintiff's seeking clarification of her position, *id* ¶¶ 100-02.

[8] Plaintiff argued during the hearing that the Supreme Court in *Babb v. Wilkie*, 206 L. Ed. 2d 432 (2020), and the subsequent Eleventh Circuit opinion in *Tonkyro v. Sec'y, VA*, 2021 U.S. App. LEXIS 11478, decided on April 20, 2021, relaxed the "severe or pervasive" standard for hostile work environment retaliation claims. However, as Plaintiff concedes, *Babb*'s holding was limited to claims under the Age Discrimination and Employment Act, not Title VII, *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); and nowhere in the *Babb* opinion is the "severe or pervasive" standard discussed. In any event, the "severe or pervasive" standard is well established in the Fourth Circuit. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019) ("To establish that race-based harassment was sufficiently severe or pervasive under Title VII, [Plaintiff] 'must show that a reasonable jury could find that the . . . race-based harassment was so severe or pervasive as to alter the conditions of [Plaintiff's] employment and create an abusive or hostile atmosphere.'") (citing *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009)); *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019) ("[P]laintiffs must clear a high bar in order to satisfy the [objective] severe or pervasive test.") (quoting *Harris*, 510 U.S. at 23); *see also Roberts v. Glenn Indus. Grp., Inc.*, 2021 WL 2021812, at *3 (4th Cir. May 21, 2021) (Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victims' employment and create an abusive work environment.") (quoting *Harris*, 510 U.S. at 21).

27